E-FILED
Wednesday, 31 December, 2025 03:57:18 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| ELIZABETH CONLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IROQUOIS MEMORIAL HOSPITAL & RESIDENT HOME,<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Elizabeth Conley ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Iroquois Memorial Hospital & Resident Home ("Defendant" or "Iroquois Memorial"), and complains and alleges upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## I. NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendant Iroquois Memorial for its failure to secure its patients' and employees' sensitive personal information—including but not limited to first and last names, dates of birth, Social Security numbers (SSN), financial information, and other personally identifiable information ("PII"), as well as medical histories, diagnoses and treatment details, prescription information, medical record number/patient ID, health insurance information, and other protected health information ("PHI") (collectively, "PII/PHI" or "Personal Information").

2. Defendant Iroquois Memorial Hospital & Resident Home is a healthcare provider network that includes primary care clinics, specialty care clinics, a hospital, and a resident home.

3. On or around December 11, 2025, hackers breached Iroquois Memorial's databases and exfiltrated 3.5 terabytes of data that contained information about Iroquois Memorial's patients and employees (the "Data Breach"). As of December 29, 2025, Iroquois Memorial has yet to notify its patients and employees of the Data Breach.

4. Iroquois Memorial's security failures enabled the hackers to steal PII/PHI belonging to Iroquois Memorial's patients and employees. Following the Data Breach, Iroquois Memorial failed to take other reasonable steps to inform its customers of the Data Breach. By failing to provide adequate notice, Iroquois Memorial prevented (and continues to prevent) Class members from protecting themselves from the Data Breach.

5. Iroquois Memorial's failures exposed Plaintiff and Class Members to actual harm consistent with injuries that data breaches cause, including loss of the value of Plaintiff and Class Members' PII/PHI, imminent and actual threat of PII/PHI theft, and other types of quantifiable harm that stem from the Data Breach, including out-of-pocket losses and money spent on identity theft monitoring.

6. Accordingly, Plaintiff, on behalf of herself and other members of the Class, asserts claims for breach of implied contract, breach of fiduciary duty, invasion of privacy, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*., and unjust enrichment, and seeks injunctive relief, declaratory relief, monetary damages, statutory damages, and all other relief as authorized in equity or by law.

## II. JURISDICTION AND VENUE

7. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of States other than Iroquois Memorial's State of citizenship.

8. This Court has personal jurisdiction over Iroquois Memorial Hospital & Resident Home because Iroquois Memorial is headquartered in the State of Illinois and Iroquois Memorial maintains numerous locations and employees in the State of Illinois.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) as: a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, and Iroquois Memorial is headquartered in this District.

## III. <u>PARTIES</u>

***Plaintiff***

10. Elizabeth Conley is a citizen of Illinois and resides in Iroquois County, Illinois. Ms. Conley is a patient of Iroquois Memorial and provided her Personal Information to the hospital. Hackers obtained her personal information, including her medical records, when they breached Iroquois Memorial's databases.

***Defendant Iroquois Memorial***

11. Iroquois Memorial Hospital & Resident Home is a healthcare provider that provides services through its clinics, hospital, resident home, pharmacies, and outpatient services. Iroquois Memorial provides services in the state of Illinois and is a nonprofit organization headquartered in Iroquois County, Illinois.

## IV. <u>FACTUAL BACKGROUND</u>

### *A. <u>Iroquois Memorial's Operations</u>*

12. Iroquois Memorial regularly handles Personal Information belonging to its patients and employees, including medical histories, treatment records, demographic identifiers, social security numbers, and financial information.

13. Iroquois Memorial is required to keep the Personal Information of its patients

and employees confidential and to prevent unauthorized third parties from accessing this Personal Information.

14. Upon information and belief, Iroquois Memorial promised to secure the Personal Information of its patients and employees when collecting their Personal Information. Iroquois Memorial does this through its privacy policy, patient bill of rights, and other disclosures that it makes to comply with statutory requirements.

15. Iroquois Memorial's website includes a "Privacy Policy" page, communicating to its patients that it is "required by law and committed as an institution to maintain the privacy of protected health information."[1] The Privacy Policy also states that Iroquois Memorial is "required by law to comply with the terms and privacy practices stated in our Notice that is currently in effect, and we pledge to you that we will do so."[2]

16. Iroquois Memorial also published a 'Patient Bill of Rights' page, promising to patients that:

> 5. The patient has the right to every consideration of privacy. Case discussion, consultation, examination and treatment should be conducted so as to protect each patient's privacy.
>
> 6. The patient has the right to expect that all communications and records pertaining to his/her care will be treated as confidential by the hospital, except in cases such as suspected abuse and public health hazards when reporting is permitted or required by law. The patient has the right to expect that the hospital will emphasize the confidentiality of this information when it releases it to any other parties entitled to review information in these records.[3]

17. Iroquois Memorial markets itself as providing HIPAA-compliant services. Specifically, Iroquois Memorial maintains that questions about privacy practices can be

---

[1] *See* Iroquois Memorial, *Privacy Policy*, https://iroquoismemorial.com/Privacy-Policy (last visited Dec 28, 2025).

[2] *Id.*

[3] *See* Iroquois Memorial, *Patient Bill of Rights*, https://iroquoismemorial.com/Patient-Bill-Of-Rights (last visited Dec 28, 2025).

directed to the "Iroquois Memorial Hospital and Resident Home HIPAA Privacy Officer."[4]

18. As a condition of receiving services and/or employment from Iroquois Memorial, Iroquois Memorial requires that its patients and employees entrust it with highly sensitive personal information. Plaintiff and Class Members entrusted Iroquois Memorial with their Personal Information and reasonably expected that Iroquois Memorial would safeguard the information and keep it confidential.

19. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Personal Information, Iroquois Memorial assumed legal and equitable duties. Iroquois Memorial knew or should have known of its obligations to protect Plaintiff's and Class Members' Personal Information from unauthorized disclosure.

20. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Personal Information.

21. Plaintiff and Class Members relied on Iroquois Memorial to keep their Personal Information confidential and secure, to use the information for only business and health purposes, and to make only authorized disclosures of the information.

### ***B. <u>The Data Breach</u>***

22. On information and belief, on or about December 11, 2025, Iroquois Memorial suffered a ransomware attack and data exfiltration incident perpetrated by a criminal threat actor known as PEAR, resulting in the theft of data from Iroquois Memorial's systems, including protected health information ("PHI") and personally identifiable information ("PII") belonging to Iroquois Memorial's clients and HR files with information belonging to Iroquois Memorial employees.

23. PEAR is a ransomware group that threatens to leak the files of its hacking

---

[4] *See* Privacy Policy, *supra,* note 1.

targets unless it gets paid.[5]

24. As of December 29, 2025, Defendant has made no public acknowledgement of the Data Breach.

25. Unauthorized individuals can now easily access the Personal Information of Plaintiff and Class Members.

26. Iroquois Memorial failed to employ reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members. Appropriate measures include encrypting the information and deleting information when it is no longer needed. Iroquois Memorial's failures allowed cybercriminals to obtain and expose the Personal Information of Plaintiff and Class Members.

### *C. Iroquois Memorial Fails to Provide Sufficient Notice of the Data Breach to Class Members*

27. Iroquois Memorial's patients are subject to continuing damage from having their personal information compromised due to Iroquois Memorial's inadequate security. Iroquois Memorial's patients were and are entitled to clear, conspicuous, and prompt notification about the Data Breach to help them mitigate the harm and avoid additional instances of fraud as alleged herein. Iroquois Memorial, however, has failed to take reasonable steps to notify its customers that their information has been compromised.

### *D. Iroquois Memorial Failed to Comply With Industry Standards*

28. Several best practices have been identified that at minimum should be implemented by Defendant, including, but not limited to, educating all employees; creating strong passwords; adopting multi-layer security measures, including firewalls, anti-virus, and

[5] *See* Paubox, *Tri-Century Eye Care hit by PEAR ransomware attack*, https://www.paubox.com/blog/tri-century-eye-care-hit-by-pear-ransomware-attack#:~:text=According%20to%20Ransomware%20Live%2C%20the,extortion%20(%E2%80%9Cransom%E2%80%9D) (last accessed Dec 28, 2025).

anti-malware software; encryption, or making data unreadable without a key; multi-factor authentication; creating backup data; and limiting which employees can access sensitive data.

29. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

30. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC).

31. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[6]

32. To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

---

[6] *How to Protect Your Networks from RANSOMWARE*, <https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view> (last visited Apr. 16, 2025).

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

33. To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….
- Use caution with links and when entering website addresses. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's

helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- Open email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- Keep your personal information safe. Check a website's security to ensure the information you submit is encrypted before you provide it….

- Verify email senders. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email.

- If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- Inform yourself. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic[7]….

34. To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-Apply latest security updates
-Use threat and vulnerability management
-Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[7] America's Cyber Defense Agency, *Protecting Against Ransomware*, CISA (original release date Apr. 11, 2019), <https://www.cisa.gov/news-events/news/protecting-against-ransomware>.

**Build credential hygiene**

-Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[8]

35. Given that Iroquois Memorial were storing the Personal Information of Plaintiff and Class Members, Iroquois Memorial could and should have implemented all the above measures to prevent and detect cyberattacks.

36. These foregoing frameworks are existing and applicable industry standards for reasonable cybersecurity readiness and Iroquois Memorial failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

37. The occurrence of the Data Breach indicates that Iroquois Memorial failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Personal Information of an undisclosed number of individuals, including Plaintiff and Class Members.

### *E. <u>Iroquois Memorial Knew the Personal Information on Its Network Was a Target</u>*

38. Cyberattacks have become so notorious that the FBI and U.S. Secret Service

[8] Microsoft Threat Intelligence, *Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar 5, 2020), <https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/>.

have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[9]

39. In fact, according to the cybersecurity firm Mimecast, in the year 2021 companies have experienced a 49% increase in phishing attacks, a 44% increase in internal threats or data leaks by careless or negligent employees, and a 44% increase in internal threats or data leaks by malicious insiders.[10]

40. Iroquois Memorial knew and understood unprotected or exposed Personal Information in their custody is valuable and highly sought after by third parties seeking to illegally monetize that Personal Information through unauthorized access.

41. The increase in cyberattacks targeting hospitals and healthcare providers, and the attendant risk of future attacks, was widely known to the public and to anyone in the healthcare industry, and particularly to Iroquois Memorial.

42. Iroquois Memorial knew and understood the importance of safeguarding Personal Information entrusted to it by Plaintiff and Class Members, and the foreseeable consequences of their data security systems being breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Despite this, Iroquois Memorial did not take adequate cybersecurity measures to prevent the Data Breach.

---

[9] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), <https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware>.

[10] Karen Lynch, *Tightening Cybersecurity at State and Local Governments,* Mimecast (July 28, 2022), <https://www.mimecast.com/blog/tightening-cybersecurity-at-state-and-local-governments/.

### *F. Iroquois Memorial Breached Their Obligations to Plaintiff and Class Members*

43. Iroquois Memorial breached their obligations to Plaintiff and Class Members because they failed to properly maintain and safeguard its computer systems and data. Iroquois Memorial's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect customers' Personal Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e. Failing to train employees in the proper handling of emails containing Personal Information and maintain adequate email security practices; and;

f. Failing to adhere to industry standards for cybersecurity.

44. Iroquois Memorial unlawfully failed to safeguard Plaintiff's and Class Members' Personal Information by allowing cyberthieves to access Iroquois Memorial's computer network and systems which contained unsecured and unencrypted Personal Information.

45. Iroquois Memorial failed to maintain and preserve the confidentiality of Plaintiff's and Class Members' Personal Information that was compromised and accessed in the Data Breach.

46. Accordingly, as outlined below, Plaintiff and Class Members now face a present and substantially increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Iroquois Memorial.

### G. ***Cyberattacks And Data Breaches Cause Disruption And Put Plaintiff And Class Members At A Present And Substantially Increased Risk Of Fraud And Identity Theft***

47. Cyberattacks and data breaches of health care providers like Iroquois Memorial are especially problematic because they can negatively impact the daily lives of individuals affected by the attack.

48. "Mental health professionals say data breaches and other cybercrimes are increasingly taking a heavy psychological toll on the millions of Americans whose personal information is plundered by fraudsters… 'Depending on who the attackers and the victims are, the psychological effects of cyber-attacks may even rival those of traditional terrorism,' says Dr. Maria Bada, research associate at the Cambridge Cybercrime Centre at the University of Cambridge."[11]

49. In addition to the psychological toll that data breaches and cybercrime takes from its victims, such issues also impose great financial costs to victims. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[12]

50. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the

---

[11] Jessica Guyn, *Anxiety, depression and PTSD: The hidden epidemic of data breaches and cyber crimes* USA TODAY (February 24, 2020), <https://www.usatoday.com/story/tech/conferences/2020/02/21/data-breach-tips-mental-health-toll-depression-anxiety/4763823002/>.

[12] U.S. Gov. Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), <https://www.gao.gov/new.items/d07737.pdf>.

black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

51. One such example of criminals piecing together bits and pieces of compromised Personal Information for profit is the development of "Fullz" packages.[13]

52. With "Fullz" packages, cyber-criminals can cross-reference two sources of Personal Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

---

[13] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), <https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/>.

53. The development of "Fullz" packages means here that the stolen Personal Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Personal Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

54. The existence and prevalence of "Fullz" packages means that the Personal Information stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

55. Thus, even if certain information (such as financial account information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

56. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to identity thieves and other criminals (like illegal and scam telemarketers).

57. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven (7) years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[14]

58. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

[14] *IdentityTheft.gov*, Federal Trade Commission, <https://www.identitytheft.gov/#/Steps> (last visited Apr. 16, 2025).

59. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

60. Moreover, theft of Personal Information is also gravely serious. Personal Information is an extremely valuable property right.[15]

61. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Personal Information has considerable market value.

62. An active and robust legitimate marketplace for Personal Information exists. In 2021, the data brokering industry was worth roughly $200 billion.16 In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.17,18 Consumers who agree to provide their web browsing history to the

---

[15] John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, (2009), <https://scholarship.richmond.edu/jolt/vol15/iss4/2>. ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[16] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak,* Los Angeles Times (Nov. 5, 2019), <https://www.latimes.com/business/story/2019-11-05/column-data-brokers>.

[17] Datacoup, <https://datacoup.com/> (last visited Apr. 16, 2025).

[18] World Data Exchange, <https://worlddataexchange.com/> (last visited Apr. 16, 2025).

Nielsen Corporation can receive up to $50.00 a year.[19] Users of the personal data collection app Streamlytics can earn up to $200 a month by selling their personal information to marketing companies who use it to build consumer demographics profiles.[20]

63. Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of Personal Information can be derived not by a price at which consumers themselves actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it. For example, Plaintiff and Class Members were only to benefit from Defendant's business after providing it with their Personal Information. A consumer's ability to use their Personal Information is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit.

64. As a result of the Data Breach, Plaintiff's and Class Members' Personal Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Personal Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

65. It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when sensitive personal, medical, and/or financial information is stolen and when it is used.

66. According to the U.S. Government Accountability Office, which conducted a

---

19 Nielsen Computer & Mobile Panel, *Frequently Asked Questions,* <https://computermobilepanel.nielsen.com/ui/US/en/faqen.html> (last visited Apr. 16, 2025).

20 *How To Sell Your Own Data And Why You May Want to*, MIC <https://www.mic.com/impact/selling-personal-data-streamlytics> (last visited Apr. 16, 2025).

study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

67. Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

68. There is a strong probability that entire batches of information stolen from Defendant have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at a present and substantially increased risk of fraud and identity theft for many years into the future.

69. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come. In fact, Defendant warned impacted individuals in the notices about the Data Breach to review all statements, monitor accounts and credit reports for suspicious activity, and to sign up for credit monitoring and identity theft protection.

70. Sensitive Personal Information can sell for as much as $363 per record according to the Infosec Institute.[22] Personal Information is particularly valuable because criminals can use it to target victims with fraud and scams. Once Personal Information is stolen, fraudulent use of that information and damage to victims may continue for years.

71. For example, the Social Security Administration has warned that identity

---

[21] *See* GAO Report, *supra*, at 29.

[22] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), <https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/>.

thieves can use an individual's Social Security number to apply for additional credit lines.[23] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[24] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

72. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

73. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he

74. Credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

75. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers

---

23 *Identity Theft and Your Social Security Number*, Social Security Administration (2018), <https://www.ssa.gov/pubs/EN-05-10064.pdf>.

24 *Id.* at 4.

25 Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), <http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft>.

are worth more than 10x on the black market."[26]

76. Medical information is especially valuable to identity thieves. A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[27] Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.

77. According to account monitoring company LogDog, in 2016 medical data was selling for $50 and up.[28]

78. For these reasons, Iroquois Memorial knew or should have known about these dangers and strengthened their data and email handling systems accordingly. Iroquois Memorial were put on notice of the substantial and foreseeable risk of harm from a data breach yet failed to properly prepare for that risk.

### ***H. Plaintiff's and Class Members' Damages***

79. To date, Iroquois Memorial has done nothing to provide Plaintiff and the Class Members with relief for the damages they have suffered as a result of the Data Breach.

80. Plaintiff's and Class Members' Personal Information was compromised in the Data Breach and is now in the hands of the cybercriminals who accessed Iroquois Memorial's

[26] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), <https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html>.

[27] *See* Elinor Mills, Study: Medical identity theft is costly for victims, CNET (Mar. 3, 2010), <https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/> (last visited Apr. 16, 2025).

[28] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, SOPHOS NEWS (Oct. 3, 2019), <https://news.sophos.com/en-us/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/>.

database and removed that Personal Information. Upon information and belief, these cybercriminals will publish Plaintiff's and Class Members' Personal Information to the internet.

81. Plaintiff's and Class Members' Personal Information was compromised and accessed as a direct and proximate result of the Data Breach, as well as Iroquois Memorial's failure to provide timely notification of the Data Breach.

82. As a direct and proximate result of Iroquois Memorial's conduct, Plaintiff's and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

83. As a direct and proximate result of Iroquois Memorial's conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

84. Plaintiff and Class Members face the present and substantially increased risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

85. Plaintiff and Class Members face the present and substantially increased risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Personal Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and Class Members.

86. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

87. Plaintiff and Class Members also suffered a loss of value of their Personal Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have

recognized the propriety of loss of value damages in related cases.

88. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service or product that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiff and Class Members paid to Defendant were intended to be used by Defendant to fund adequate security of Defendant's computer network and Plaintiff's and Class Members' Personal Information. Thus, Plaintiff's and the Class Members did not get what they paid for and agreed to.

89. Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

90. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and,

f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

91. Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Iroquois Memorial, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Personal Information is not accessible online and that access to such data is password protected or at the very least encrypted.

92. Further, as a result of Iroquois Memorial's conduct, Plaintiff and Class Members are forced to live with the substantial concern, if not outright likelihood, that their Personal Information has been disclosed to the world on the dark web or otherwise, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever. Indeed, it is the modus operandi of cybercriminals to exfiltrate such sensitive information and sell it on the dark web for profit, which is what Plaintiff, on information and belief, knows to be true in this case.

## V. CLASS ACTION ALLEGATIONS

93. Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a) and (b):

> **Nationwide Class**
> **All United States residents whose Personal Information was compromised in the Data Breach.**
>
> **Illinois Subclass**
> **All residents of the State of Illinois whose Personal Information was compromised in the Data Breach.**

94. The Nationwide Class and Illinois Subclass are collectively referred to herein as the "Class."

95. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

96. Plaintiff reserves the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

97. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. While the precise number of Class members has not yet been determined, upon information and belief, there are tens of thousands of individuals whose Personal Information were stored on Defendant's systems.

98. Commonality and Predominance. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

a. Whether Defendant owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their Personal Information;
b. Whether Defendant breached that duty;
c. Whether Plaintiff's and the Class Members' Personal Information was accessed and/or viewed by one or more unauthorized persons in the Data Breach alleged above;
d. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Personal Information had been compromised;
e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
f. Whether an implied contract existed between Defendant and Plaintiff and Class Members;
g. Whether Defendant breached its implied contract with Plaintiff and Class

Members;

h. Whether Defendant invaded Plaintiff's and Class Members' privacy;

i. Whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

j. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct;

l. Whether Plaintiff and Class Members are entitled to equitable relief; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

99. Typicality. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other member, was exposed to virtually identical conduct and now suffers from the same violations of the law as other members of the Class.

100. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class each as a whole, not on facts or law applicable only to Plaintiff.

101. Adequacy. Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members she seeks to represent; she has retained counsel competent and experienced in complex class action litigation; and Plaintiff

will prosecute this action vigorously.

102. Superiority and Manageability. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large institution, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

103. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

104. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with

prosecuting this lawsuit as a class action.

105. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

106. Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the Personal Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Nationwide Class)

107. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

108. Defendant provides medical treatment and care to Plaintiff and Class members.

109. Defendant formed an implied contract with Plaintiff and Class members through their collective conduct.

110. Through Defendant's provision of services, it knew or should have known that it must protect Plaintiff's and Class members' confidential PII and PHI in accordance with Defendant's stated policies, practices and applicable law.

111. As consideration, Plaintiff and Class members turned over valuable PII and PHI in exchange for either medical services or care.

112. Defendant accepted possession of Plaintiff's and Class members' PII and PHI for the purpose of providing services to Plaintiff and the Class members. In delivering their PII and PHI to Defendant, Plaintiff and the Class members intended and understood that Defendant would adequately safeguard the PII as part of the provision or receipt of those services.

113. Defendant's implied promises to Plaintiff and Class members include, but are not limited to Defendant: (1) taking steps to ensure that anyone who is granted access to PII and PHI also protects the confidentiality of that data; (2) taking steps to ensure that the PII and PHI placed in control of Defendant's employees is restricted and limited only to achieve authorized business purposes; (3) restricting access to employees and/or agents who are qualified and trained; (4) designing and implementing appropriate retention policies to protect PII and PHI; (5) applying or requiring proper encryption and/or the separation of different data sets; (6) implementing multifactor authentication for access; and (7) taking other steps to protected against foreseeable breaches.

114. Plaintiff and Class members would not have entrusted their PII and PHI to Defendant in the absence of such an implied contract.

115. Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class members' PII and PHI.

116. Plaintiff and Class members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein. Plaintiff seeks damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiff and the Nationwide Class)**

117. Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

118. A relationship existed between Plaintiff and Class Members and Defendant in which Plaintiff and Class Members put their trust in Defendant to protect the Personal Information of Plaintiff and Class Members and Defendant accepted that trust.

119. Defendant breached the fiduciary duties that they owed to Plaintiff and Class

Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the Personal Information of Plaintiff and Class Members.

120. Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

121. But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

122. Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

123. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages, and injunctive relief.

**<u>THIRD CAUSE OF ACTION</u>**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**(On behalf of Plaintiff and the Nationwide Class)**

124. Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

125. Plaintiff and Class members had a reasonable expectation of privacy in the PII/PHI that Defendant disclosed without authorization.

126. Defendant's conduct intruded upon Plaintiff's and Class members' seclusion under common law.

127. By failing to keep Plaintiff's and Class Members' PII/PHI safe, knowingly employing inadequate data privacy policies and protocols, and disclosing PII/PHI to unauthorized parties for unauthorized use, Defendant unlawfully invaded Plaintiff's and Class Members' privacy by, *inter alia*:

a. intruding into Plaintiff's and Class members' private affairs in a manner that would be highly offensive to a reasonable person;

b. invading Plaintiff's and Class members' privacy by improperly using their PII/PHI properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c. failing to adequately secure PII/PHI from disclosure to unauthorized persons; and

d. enabling the disclosure of Plaintiff's and Class members' PII/PHI without consent.

128. Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class members' position would consider their actions highly offensive.

129. Defendant knew that its IT systems and servers were vulnerable to data breaches prior to the Data Breach.

130. Defendant invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by disclosing their PII/PHI to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

131. As a proximate result of such unauthorized disclosures, Plaintiff's and Class members' reasonable expectations of privacy in their PII/PHI was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

132. In failing to protect Plaintiff's and Class members' PII/PHI, and in disclosing Plaintiff's and Class members' PII/PHI, Defendant acted with malice and oppression and in conscious disregard of Plaintiff's and Class members' rights to have such information kept

confidential and private.

133. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA"), 815 ILCS 505/2, *et seq*.**
**(On behalf of Plaintiff and the Nationwide Class or, Alternatively, the Illinois Subclass)**

134. Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

135. Defendant offered and continue to offer healthcare services and other related services in the State of Illinois.

136. Plaintiff and class members purchased and received medical services or other health related services from Defendant for personal, family, or household purposes.

137. Defendant engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiff's and Class members' Personal Information in a manner that complied with applicable laws, regulations, and industry standards.

138. Defendant makes explicit statements to Plaintiff and Class members that their Personal Information will remain private.

139. Defendant further violated the ICFA by failing to notify Plaintiff and Class members of the Data Breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20. 123.

140. Due to the Data Breach, Plaintiff and Class members have lost property in the form of: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal Information which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (On behalf of Plaintiff and the Nationwide Class)

141. Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

142. This Count is alternatively pled to Count III, Breach of Implied Contract.

143. Plaintiff and Class Members conferred a benefit on Defendant with their money or labor services. Specifically, they purchased goods and services from Defendant and/or provided their labor and in so doing also provided Defendant with their PII and PHI. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and should have had their PII and PHI protected with adequate data security.

144. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

145. In particular, the Defendant enriched itself by saving the costs it reasonably

should have expended on data security measures to secure Plaintiff and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

146. Defendant failed to secure Plaintiff's and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

147. Defendant acquired the PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

148. If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

149. Plaintiff and Class Members have no adequate remedy at law.

150. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their PII and PHI is used; (c) the compromise, publication, and/or theft of their PII and PHI; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and PHI; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach,

including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and PHI in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

151. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

152. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this complaint so triable.

## VIII. REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Class, requests judgment against Defendant and that the Court grant the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Personal Information of Plaintiff and the members of the Class, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and

other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and the members of the Class;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Personal Information of Plaintiff and the members of the Class;

v. prohibiting Defendant from maintaining the Personal Information of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised,

hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all members of the Class about the threats that they face as a result of the loss of their confidential Personal Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years,

appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment and/or post-judgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

Dated: December 31, 2025

Respectfully submitted,

By: /s/ Eugene Y. Turin

Eugene Y. Turin
MCGUIRE LAW, P.C.
55 West Wacker Drive, 9th Fl.
Chicago, Illinois 60601
T: (312) 893-7002
F: (312) 275-7354
eturin@mcgpc.com

Bradley K. King*
AHDOOT & WOLFSON, PC
521 5th Avenue, 17th Floor
New York, NY 10175
Tel: (917) 336-0171
Fax: (917) 336-0177
bking@ahdootwolfson.com

* *pro hac vice* application forthcoming

*Counsel for Plaintiff and the Proposed Class*